AO 91 (Rev. 11/11) Criminal Complaint

| LODGED |
| CLERK, U.S. DISTRICT COURT |
| 04/28/2025 |
| CENTRAL DISTRICT OF CALIFORNIA |
| BY: _____ AP _____ DEPUTY |

# UNITED STATES DISTRICT COURT

for the

Central District of California

| FILED |
| CLERK, U.S. DISTRICT COURT |
| 4/28/2025 |
| CENTRAL DISTRICT OF CALIFORNIA |
| BY: ____ D.C. ____ DEPUTY |

United States of America

v.

KAYLO STAROSTKA,

Defendant.

Case No.  5:25-mj-00248

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of February 3, 2025, in the county of San Bernardino in the Central District of California, the defendant violated:

| Code Section | Offense Description |
| --- | --- |
| 21 U.S.C. § 841(a)(1) | Possession with Intent to Distribute a Controlled Substance |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
*Complainant's signature*

Monica Lozano, ATF Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  _____4/28/2025_____

_____
*Judge's signature*

City and state:  _Riverside, California_

Hon. Shashi H. Kewalramani, U.S. Magistrate Judge
*Printed name and title*

AUSA: Matthew Tang (x0470)

## AFFIDAVIT

I, Monica Lozano, being duly sworn, declare and state as follows:

### I.  PURPOSE OF AFFIDAVIT

1.  This affidavit is made in support of a criminal complaint and arrest warrant against Kaylo Starostka ("STAROSTKA") for a violation of 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute a Controlled Substance.

2.  This affidavit is also made in support of an application for a warrant to search the following digital device (the "SUBJECT DEVICE"), in the custody of the Bureau of Alcohol, Tobacco, Firearms and Explosives, in Riverside, California, as described more fully in Attachment A: one blue Apple iPhone.

3.  The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (possession with intent to distribute controlled substances) and 846 (conspiracy and attempt to distribute controlled substances) and 18 U.S.C. §§ 922(g) (prohibited person in possession of a firearm) and 924(c) (possession of a firearm in furtherance of a drug trafficking crime) (the "Subject Offenses"), as described more fully in Attachment B.  Attachments A and B are incorporated herein by reference.

4.  The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there

is sufficient probable cause for the requested complaint, arrest warrant, and search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

5.     I am a Special Agent ("SA") with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), and have held this position since September 2015.  I am a law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), and as such, I am empowered by law to conduct investigations and make arrests for the offenses enumerated within the United States Code.

6.     I have completed the ATF Special Agent Basic Training program at the Federal Law Enforcement Training Center ("FLETC") as well as the Department of Homeland Security ("DHS") Criminal Investigator Training Program at the Federal Law Enforcement Training Center in Glynco, Georgia.  I have received training in federal laws and regulations which I regularly refer to during my duties.  I routinely participate in investigations and the execution of search and arrest warrants for violations of these statutes.

7.     Additionally, I have completed the ATF Firearms Interstate Nexus advanced training and routinely examine firearms and ammunition to determine their origin and travel in interstate commerce.  My education also includes a Bachelor of

Arts degree in Finance from the California State University in Fullerton.

8.    I am currently assigned to the ATF San Bernardino Satellite Office, where I conduct proactive criminal investigations, participate in the execution of arrests and search warrants, conduct firearm and ammunition examinations, and author interstate nexus reports.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

9.    From October 2024 through January 2025, the San Bernardino County Sheriff's Department received four anonymous tips stating that STAROSTKA possessed several firearms and sold drugs from his residence at 18450 Temecula Avenue in Hesperia, California (the "Temecula Residence").  In January 2025, law enforcement investigators observed several vehicles visiting the residence for short periods of time.  On at least one occasion, someone who matched STAROSTKA's description approached a vehicle and made a hand-to-hand exchange with an occupant of the vehicle.  Based in part on this information, San Bernardino County Sheriff's Deputies obtained a state warrant to search the residence.

10.   On February 3, 2025, San Bernardino County Sheriff's Deputies executed the search warrant at the Temecula Residence. While searching a portion of the garage that had been converted into a bedroom, they found several firearms and ammunition, as well as various white powder substances and white crystalline substances that collectively weighed approximately 1.2 pounds. 2.69 grams of the white crystalline substances tested positive

for methamphetamine.  The deputies also found a wallet in the converted bedroom containing STAROSTKA's California driver's license, several documents containing STAROSTKA's name on it, and the SUBJECT DEVICE.

11.  STAROSTKA has at least four felony convictions, including two related to drug trafficking.

## IV. <u>STATEMENT OF PROBABLE CAUSE</u>

12.  Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

### A.  Anonymous Tips and Surveillance of STAROSTKA's Residence

13.  On October 3, 2024, December 8, 2024, January 4, 2025, and January 20, 2025, the San Bernardino County Sheriff's Department received anonymous tips concerning STAROSTKA through an online portal called WeTip.  Each of the tips stated, in substance and summary, that STAROSTKA possessed firearms and sold drugs from the Temecula Residence.

14.  From January 20, 2025, through January 29, 2025, law enforcement investigators surveilled the Temecula Residence and noticed an unusually high number of vehicles visiting that location.  In many instances, vehicles would arrive at the location and leave after only a short time.  On at least one occasion, someone who matched STAROSTKA's description approached a vehicle and made a hand-to-hand exchange with an occupant of the vehicle.  Based in part on this information, San Bernardino

County Sheriff's Deputies obtained a warrant to search the residence.

**B.    Execution of the Search Warrant**

15.    On February 3, 2025, San Bernardino County Sheriff's Deputies executed a search warrant at the Temecula Residence. They found STAROSTKA sitting in a car in the driveway of the residence and detained him.  They found STAROSTKA's father near the front door of the residence and detained him as well.  No one else was at the Temecula Residence.

16.    STAROSTKA's father told the deputies that he, his wife, and STAROSTKA were the only people who lived at the residence.

17.    STAROSTKA's father stated that he owned guns in a safe located inside the residence.  The deputies found a safe inside the main portion of the residence, and when they searched the safe, they discovered two firearms.  STAROSTKA's father did not mention owning or knowing about any other firearms at the residence.  He also stated that, to his knowledge, STAROSTKA did not possess any firearms or ammunition, and that STAROSTKA only used marijuana.

18.    When the deputies searched the garage, they found that a portion of the garage had been converted into a bedroom. Because the door to the bedroom was secured by a keypad, and because both STAROSTKA and his father claimed they could not recall the keypad code that would open the door, the deputies forced entry into the bedroom.

19.    Inside of the converted bedroom, the deputies found the following firearms:

a.    one black Hatsan Arms Co., model Escort Magnum 12-gauge semi-automatic shotgun, bearing the serial number 305392;

b.    one black Charles Daly 12-gauge pump action shotgun, bearing the serial number 9513849;

c.    one green Zavastava, model 59/66A1, 7.62x39mm caliber, SKS type rifle, bearing the serial number 0-579109;

d.    one chrome Cobra Enterprises, Inc. model CB38, .38 Special Derringer handgun, bearing the serial number CT200763;

e.    one black Hi-Point Firearms, model 995, 9mm caliber rifle, bearing serial number F22823;

f.    one Smith & Wesson, model 19-4, .357 caliber revolver, bearing serial number 36K0813;

g.    one black privately manufactured, 5.56 NATO caliber, Palmetto PSAR-SET AR-style rifle equipped with a suspected machinegun conversion device;

h.    one black privately manufactured, AR-15 style, 5.56 caliber Short Barrel rifle, bearing no serial number, with an attached suspected silencer;

i.    one Sears, Roebuck and Co., model JC Higgins 20, 12 gauge weapon suspected to be made from a shotgun, with an obliterated serial number;

j.    one Mosin-Nagant model M91/30, 7.62x54R bolt action rifle, bearing the serial number 158032.

k.    one gray and black, privately manufactured, .22 LR caliber pistol, bearing no serial number;

l.    one tan and silver Glock-style privately manufactured, 9mm pistol, bearing no serial number, loaded with a large-capacity magazine containing 9mm ammunition;

m.    one black privately manufactured, 7.62x51mm caliber, AR-style rifle, bearing the serial number ELA1871957; and

n.    one chrome privately manufactured, .223 caliber AR-style rifle, bearing no serial number.

20.  Inside of the converted bedroom, the deputies also found several plastic baggies and other containers containing white powder and crystalline substances that collectively weighed approximately 1.2 pounds.  The San Bernardino County Sheriff's Department tested 2.69 grams of the white crystalline substance and determined that it contained methamphetamine.

21.  Finally, the deputies found a wallet containing STAROSTKA's California driver's license, several documents containing STAROSTKA's name on it, and the SUBJECT DEVICE.

**C.    Criminal History**

22.  On April 23, 2025, I reviewed certified conviction documents for STAROSTKA and learned that STAROSTKA has previously been convicted of the following felony crimes punishable by a term of imprisonment exceeding one year:

a.    On or about December 11, 2006, a violation of California Health and Safety Code Section 11378 (Possession for Sale of a Controlled Substance), in the Superior Court for the

State of California, County of San Bernardino, Case Number
FCH08298;

      b.    On or about April 6, 2007, a violation of
California Health and Safety Code Section 11378 (Possession for
Sale of a Controlled Substance), in the Superior Court for the
State of California, County of Los Angeles, Case Number
KA078699;

      c.    On or about June 26, 2015, violations of
California Penal Code Section 273.5(a) (Inflicting Corporal
Injury on a Spouse/Cohabitant) and California Penal Code Section
422 (Threatening a Crime), in the Superior Court for the State
of California, County of San Bernardino, Case Number FVI1303500;
and

      d.    On or about May 14, 2020, a violation of
California Penal Code Sections 664, 29800 (Attempted Possession
of Dangerous Weapons), in the Superior Court for the State of
California, County of San Bernardino, Case Number FVI20000521.

    **D.**   **Drug Test**

    23.  Based on my review of a San Bernardino County
Sheriff's Department Scientific Investigations Division report,
I know that 2.69 grams of the white crystalline substance seized
from the converted bedroom at the Temecula Residence was tested.
The report indicated that the white crystalline substance
contained methamphetamine.

    **E.**   **Interstate Nexus**

    24.  On February 18 2025, and March 14, 2025, I examined
the following firearms seized from the converted bedroom of the

Temecula Residence and confirmed that they were manufactured outside of the State of California:

     a.   one black Hatsan Arms Co., model Escort Magnum 12-gauge semi-automatic shotgun, bearing the serial number 305392;

     b.   one black Charles Daly 12-gauge pump action shotgun, bearing the serial number 9513849;

     c.   one green Zavastava, model 59/66A1, 7.62x39mm caliber, SKS type rifle, bearing the serial number 0-579109;

     d.   one chrome Cobra Enterprises, Inc. model CB38, .38 Special Derringer handgun, bearing the serial number CT200763;

     e.   one black Hi-Point Firearms, model 995, 9mm caliber rifle, bearing serial number F22823; and

     f.   one Smith & Wesson, model 19-4, .357 caliber revolver, bearing serial number 36K0813.

25.  Because the firearms were found in California, I believe that they have traveled in and affected interstate commerce.

## V.  TRAINING AND EXPERIENCE ON DRUG OFFENSES

26.  Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

     a.   Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds.  Drug

traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

b.   Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained where the drug trafficker has ready access to them, such as on their cell phones and other digital devices.

c.   Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

d.   Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their

digital devices, including in the form of calendar entries and location data.

## VI. TRAINING AND EXPERIENCE ON FIREARMS OFFENSES

27.  From my training, personal experience, and the collective experiences related to me by other law enforcement officers who conduct who conduct firearms investigations, I am aware of the following:

a.  Persons who possess, purchase, or sell firearms generally maintain records of their firearm transactions as items of value and usually keep them in their residence, or in places that are readily accessible, and under their physical control, such in their digital devices.  It has been my experience that prohibited individuals who own firearms illegally will keep the contact information of the individual who is supplying firearms to prohibited individuals or other individuals involved in criminal activities for future purchases or referrals.  Such information is also kept on digital devices.

b.  Many people also keep mementos of their firearms, including digital photographs or recordings of themselves possessing or using firearms on their digital devices.  These photographs and recordings are often shared via social media, text messages, and over text messaging applications.

c.  Those who illegally possess firearms often sell their firearms and purchase firearms.  Correspondence between persons buying and selling firearms often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices.  This

includes sending photos of the firearm between the seller and
the buyer, as well as negotiation of price.  In my experience,
individuals who engage in street sales of firearms frequently
use phone calls, e-mail, and text messages to communicate with
each other regarding firearms that the sell or offer for sale.
In addition, it is common for individuals engaging in the
unlawful sale of firearms to have photographs of firearms they
or other individuals working with them possess on their cellular
phones and other digital devices as they frequently send these
photos to each other to boast of their firearms possession
and/or to facilitate sales or transfers of firearms.

## VII.  TRAINING AND EXPERIENCE ON DIGITAL DEVICES

28.  As used herein, the term "digital device" includes the
SUBJECT DEVICE.

29.  Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that the following electronic evidence, inter alia, is
often retrievable from digital devices:

a.  Forensic methods may uncover electronic files or
remnants of such files months or even years after the files have
been downloaded, deleted, or viewed via the Internet.  Normally,
when a person deletes a file on a computer, the data contained
in the file does not disappear; rather, the data remain on the
hard drive until overwritten by new data, which may only occur
after a long period of time.  Similarly, files viewed on the
Internet are often automatically downloaded into a temporary
directory or cache that are only overwritten as they are

replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously

develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

30. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

b. Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

31. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a. Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical

feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.    In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

c.    The person who is in possession of a device or has the device among his or her belongings is likely a user of the device. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress STAROSTKA's thumb- and/or fingers on the device; and (2) hold the device in front of STAROSTKA's face with his eyes open to activate the facial-, iris-, and/or retina-recognition feature.

32.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VIII.     CONCLUSION

33.  For all of the reasons described above, there is probable cause to believe that Kaylo Starostka has committed a violation of 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute a Controlled Substance.  There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICE described in Attachment A.

_____
Monica Lozano, Special Agent
ATF


Subscribed to and sworn before me
this 28th day of April, 2025.

_____
THE HONORABLE SHASHI H. KEWALRAMANI
UNITED STATES MAGISTRATE JUDGE